THEODORE J. LEOPOLD (*pro hac forthcoming*)
**COHEN MILSTEIN SELLERS & TOLL PLLC**
2925 PGA Boulevard, Suite 200
Palm Beach Gardens, FL 33410
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
tleopold@cohenmilstein.com

DAVID J. SHEA (P41399)
BRIAN C. GRANT (P71066)
**SHEA AIELLO PLLC**
21600 American Dr., Second Floor
Southfield, MI 48034
Telephone: (248) 354-0224
Facsimile: (248) 354-0440
david.shea@sadplaw.com
brian.grant@sadplaw.com

*Counsel for Plaintiffs and Proposed Classes*

[Additional counsel on signature page]

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| TAD LEROY, RUSSELL BLOOM, and SING SUN, on behalf of themselves and all other similarly situated, <br><br> Plaintiffs, <br><br> vs. <br><br> FIAT CHRYSLER AUTOMOBILES N.V. and FCA US LLC, <br><br> Defendants. | Case No.: _____ <br><br> CIVIL CLASS ACTION COMPLAINT <br><br> DEMAND FOR JURY TRIAL |

Plaintiffs Tad Leroy, Russell Bloom, and Sing Sun ("Plaintiffs") allege the following on behalf of themselves and all others similarly situated against Fiat Chrysler Automobiles N.V. and FCA US LLC ("Fiat" or "Defendants").

## NATURE OF THE CASE

1.     Plaintiffs brings this class action complaint on behalf of themselves and similarly situated consumers who purchased or leased any of the over 103,000 diesel Dodge Ram and Jeep Grand Cherokee vehicles sold in the United States since 2014 containing undisclosed Auxiliary Emission Control Devices (the "Class Vehicles").

2.     The market for environmentally-friendly, "green" vehicles has surged in recent years. Consumers are often faced with a tradeoff, however:  power and fuel economy for lower emissions. Fiat advertised and marketed that its "eco diesel" Dodge Ram and Jeep Cherokee vehicles provided fuel economy and high performance, while also reducing emissions. Customers were promised that better mileage per gallon would lead to lower fuel costs, balancing out the premium paid at the point of purchase.

3.     However, instead of manufacturing vehicles with the attributes advertised and represented to customers, Fiat included eight unapproved Auxiliary Emission Control Devices ("Unapproved AECDs") in the Class Vehicles: software that made it seem as though their Vehicles had low emissions and excellent fuel economy in addition to the desirable power for testing purposes. However, in real-world driving conditions, the Vehicles did not perform in the same manner.

4.     Although investigations are ongoing, according to the United States Environmental Protection Agency ("EPA") and the latest reports, the Unapproved AECDs were installed in at least the following diesel models of Fiat vehicles:  Model Year ("MY") 2014-2016

Dodge Ram 1500 with 3.0 liter engines, and MY 2014-2016 Jeep Grand Cherokee with a 3.0 liter engine.

5.     As a result of Fiat's misrepresentations and deliberate omissions, Fiat sold or leased about 103,000 vehicles in the United States that purported to be environmentally-friendly but in fact were far from being so.  The EPA's findings thus far are summarized in a Notice of Violation ("NOV"), attached to this Complaint as Exhibit A.

6.     Plaintiffs bring this suit on behalf of themselves and proposed Florida and California statewide classes.

## PARTIES

7.     Plaintiff Tad LeRoy is a citizen and resident of Martin County, Florida. Plaintiff leased his 2016 Dodge Ram 1500 (with a 3.0 liter engine) in May 2016 in Fort Myers, Florida.

8.     Plaintiff Russell Bloom is a citizen and resident of Kern County, California. Plaintiff purchased his 2016 Dodge Ram 1600 (with a 3.0 liter engine) in February 2016 in Bakersfield, California.

9.     Plaintiff Sing Sun is a citizen and resident of Orange County, Florida. Plaintiff purchased his 2015 Dodge Ram 1500 (with a 3.0 liter engine) in April 2015 in Orlando, Florida.

10.     Defendant Fiat Chrysler Automobiles N.V. is incorporated in Netherlands, and has a principal place of business of London, United Kingdom. Fiat Chrysler Automobiles N.V. is therefore a citizen of both the Netherlands and United Kingdom. Fiat Chrysler Automobiles N.V. is an international automotive group that designs, manufactures, distributes, and sells automobiles. Fiat Chrysler Automobiles N.V.'s brands include Dodge and Jeep.

11.     Defendant FCA US LLC is incorporated in Delaware, and has a principal place of business of 1000 Chrysler Drive, Auburn Hills, Michigan 48326. FCA US LLC is therefore a citizen of Delaware and Michigan. FCA US LLC is a subsidiary of Fiat Chrysler Automobiles

N.V. and sells Fiat Chrysler Automobiles N.V. vehicles in the United States.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over this action under 28 U.S.C.

§1332(d)(2) because this is a class action wherein the amount in controversy exceeds the sum or

value of $5,000,000, exclusive of interest and costs; there are more than 100 members in the

proposed class; and at least one member of the class of Plaintiffs is a citizen of a state different

from a Defendant.

13.     This Court has personal jurisdiction over Defendant FCA US LLC because it is a

Michigan citizen. This Court has personal jurisdiction over Defendant Fiat Chrysler Automobiles

N.V. because it conducts substantial business in Michigan, and substantial part of the events or

omissions giving rise to the claims occurred and/or emanated from Michigan.

14.     Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial

part of the events or omissions giving rise to the claims occurred and/or emanated from this

District, and because Defendants have caused harm to Class members residing in this District.

## FACTUAL ALLEGATIONS

### A.  Fiat's Fraudulent Conduct

15.     Since at least 2014, Fiat marketed that the Class Vehicles had "eco diesel"

engines, possessing unique and desirable qualities. For example, Fiat advertised, "Forget

everything you thought you knew about diesel. The Jeep EcoDiesel engine offers innovative

technology that is efficient, increases range and improves power – all while leaving little trace of

being there."[1]

---

[1] http://www.jeep.com/en/jeep-capabilities/eco-diesel-calculator/#introduction (last accessed Jan. 19, 2017).



16.     Fiat advertised that their 3.0 liter "eco diesel" engines for Class Vehicles combined "Best-in-Class fuel economy" with lower emissions.[2]

## 3.0L EcoDiesel V6 Engine

Awe-inspiring performance combined with Best-in-Class fuel economy⬤–that's what the 3.0L EcoDiesel V6 engine gives you. A marvel of modern engineering, with a block made of compacted graphite iron and aluminum twin-cam heads, the engine delivers quiet, clean-diesel technology with low $CO_2$ emissions.

Fiat made similar representations on multiple websites.[3]

---

[2] *Id.*

[3] *See, e.g.,* http://www.ramtrucks.com/en/diesel/ (last accessed Jan. 19, 2017).



17.     Plaintiffs LeRoy, Bloom, and Sun all viewed Fiat's advertisements for Class Vehicles and their "eco diesel" engines, and relied upon Fiat's representations that Class Vehicles had lower emissions and superior fuel economy than diesel vehicles without "eco diesel" engines.

18.     Based upon the recent Notice of Violation filed by the EPA, the Class Vehicles were equipped with eight undisclosed AECDs in violation of Federal law. The EPA administers a certification program to ensure that every vehicle introduced in the United States satisfies applicable emissions standards. Exhibit A at 3. In order to obtain a certificate of conformity ("COC"), a light-duty vehicle manufacturer must submit a COC application. Among other things, the COC application must list all AECDs installed in the vehicle. *See* 40 C.F.R. § 86.1844-01(d)(11); Exhibit A at 3. A motor vehicle with undisclosed AECDs cannot be certified. Exhibit A at 4.

19.     According to the Notice of Violation, Fiat failed to disclose eight AECDs used in Class Vehicles. *See* Exhibit A at 1. Defendants "did not disclose these AECDs to the EPA in their applications for COCs, despite being aware that the AECDs were required to be disclosed." *See* Exhibit A at 2. Because of the Unapproved AECDs, the Class Vehicles do not conform in material respects to the vehicle specifications in their applications for certificates of conformity.

*See* Exhibit A at 2. Thus, Defendants violated section 203(a)(1) of the Clean Air Act, 42 U.S.C. § 7522(a)(1), see *id*, and the Class Vehicles are no longer covered by their COCs. Exhibit A at 3-4.

20.      The EPA also found that one or more of the Unapproved AECDs results in excess emissions of nitrogen oxides (NOx). See Exhibit A at 2. Nitrogen oxide pollution creates both health risks (e.g., respiratory diseases) and environmental hazards (e.g., smog).

21.      The EPA believes that one or more of the Unapproved AECDs reduce the effectiveness of the emission controls during normal vehicle operation and use, but not during the federal emission test procedure. Exhibit A at 6. Thus, the Unapproved AECDs caused the Class Vehicles to *appear* to have lower emissions of NOx during EPA testing than they actually emit during normal use.

**B.      Plaintiffs and Purchasers of the Class Vehicle Suffered Damages**

22.      Plaintiffs and the Class paid a premium for the Class Vehicles, believing them to possess unique and desirable qualities over less expensive base models.

23.      Had Plaintiffs and Class members known of the Unapproved AECDs at the time they purchased or leased their Class Vehicles, they would not have purchased or leased those vehicles, or would have paid substantially less for the vehicles than they did.

24.      Plaintiffs and Class members would not have purchased, or would have paid less for, Class Vehicles if Fiat had not represented that Class Vehicles possessed "eco diesel" engines with superior qualities, including lower emissions and enhanced fuel economy.

25.      Purchasers of the Class Vehicles, like Plaintiffs Leroy, Bloom, and Sun, have suffered an ascertainable loss as result of Fiat's misconduct. First, they overpaid from for the "eco diesel" engines, based upon inaccurate and incomplete information about how the Class

Vehicles would perform in the real world. Second, the Class Vehicles cannot reasonably be re-sold until the Unapproved AECDs have been accepted by the EPA, or have been removed and replaced. Third, the resale value for these vehicles will dramatically decline as the market has learned that Fiat violated Federal law in designing the vehicles. Fourth, the eventual repair for the Class Vehicles will necessitate new software or hardware that will properly engage the emissions systems. That will most likely mean reduced performance and fuel economy, also impacting resale value. Therefore, even assuming Fiat can alter the Class Vehicles to make them EPA-compliant (a fact not yet known), Class Members will be damaged by the loss of performance and fuel efficiency of their vehicles (causing them to pay more for gas) and the diminution of value related to same.

26.     In sum, Plaintiffs and those similarly situated did not receive the cars they bargained for, and Fiat should be held accountable for its deliberate deception.

## TOLLING OF THE STATUTE OF LIMITATIONS

27.     Fiat knowingly and intentionally concealed the existence of the Unapproved AECDs from Class Members, intending to deceive them.  Plaintiffs and the Class were not reasonably able to discover the existence of the Unapproved AECDs until January 2017, at which point the existence of the Unapproved AECDs became national news following the EPA's Notice of Violation for Class Vehicles.

28.     Any applicable statute of limitations was tolled by Fiat's wrongful concealment of the Unapproved AECDs, which fooled even trained emissions officials. Fiat is further estopped from relying on any statute of limitation because of its concealment of the Unapproved AECDs installed in the Class Vehicles.

## CLASS ACTION ALLEGATIONS

29.     Plaintiffs re-allege and incorporates by reference herein all of the allegations contained herein.

30.     Pursuant to Federal Rule of Civil Procedure 23(b)(3), Plaintiffs brings this action on behalf of themselves and the following classes of all persons similarly situated and defined as follows (collectively referred to as the "Classes"):

(a) Florida Class: All persons or entities who are current or former owners and/or lessees of a Class Vehicle who are citizens or residents of Florida, including without limitation, MY 2014-2016 Dodge Ram (with a 3.0 L engine) and 2014-2016 MY Jeep Grand Cherokee (with 3.0 L engine).

(b) California Class: All persons or entities who are current or former owners and/or lessees of a Class Vehicle who are citizens or residents of California, including without limitation, MY 2014-2016 Dodge Ram (with a 3.0 L engine) and 2014-2016 MY Jeep Grand Cherokee (with 3.0 L engine).

31.     Plaintiffs reserve the right to modify or amend the definition of the proposed Classes before the Court determines whether certification is appropriate.

32.     This action has been brought and may properly be maintained as a class action as it satisfies the numerosity, commonality, typicality, adequacy, and superiority requirements. Plaintiffs seek to represent an ascertainable Classes with a well-defined community of interest in the questions of law and fact involved in this matter.

33.     Although the precise number of Class members is unknown and can only be determined through appropriate discovery, Plaintiffs believes and, on that basis, alleges that the proposed class is so numerous that joinder of all members would be impracticable. The number of vehicles currently estimated to be impacted is in excess of 103,000. On information and belief,

the number of people who purchased Class Vehicles in California and Florida alone is in the thousands, such that the number of individual plaintiffs would make joinder impossible.

34. Questions of law and fact common to the Plaintiff Class exist that predominate over questions affecting only individual members, including *inter alia*:

  a. Whether Fiat included Unapproved AECDs in Class Vehicles;

  b. Whether Class Vehicles fail to comply with applicable federal and state emissions laws and regulations as a result of the Unapproved AECDs;

  c. Whether Fiat had a duty to disclose the existence of the Unapproved AECDs and its consequences to consumers;

  d. Whether the existence of the Unapproved AECDs and its consequences would be considered material by an objectively reasonable consumer;

  e. Whether Fiat's conduct violates any applicable warranties; and

  f. Whether Plaintiffs were injured as a result of Fiat's conduct.

35. Plaintiffs are members of the putative Classes. The claims asserted by the Plaintiffs in this action are typical of the claims of the members of the putative Classes, as the claims arise from the same course of conduct by Defendants and the relief sought is common. Plaintiffs and Class members' injuries, in the form of losses incurred as a result of, *inter alia*, diminution of value of the vehicles owned or leased, are the result of the same misconduct by Defendants alleged herein and Plaintiffs and Class members assert the same claims for relief.

36. Plaintiffs will fairly and adequately represent and protect the interests of the members of the putative Classes, as his interests are coincident with, not antagonistic to, the other Class members. Plaintiffs have retained counsel competent and experienced in both consumer protection and class action litigation.

37.     Certification of the Classes is appropriate pursuant to Federal Rule of Civil Procedure 23(b)(3) because Defendants have acted with respect to the Classes in a manner generally applicable to each Class member, there is a well-defined community of interest in the questions of law and fact involved in the action, which affect all class members, and questions of law or fact common to the respective members of the Classes predominate over questions of law or fact affecting only individual members. This predominance makes class litigation superior to any other method available for the fair and efficient adjudication of these claims including consistency of adjudications.  Absent a class action, it would be highly unlikely that the members of the Classes would be able to protect their own interests because the cost of litigation through individual lawsuits might exceed the expected recovery.

38.     A class action is an appropriate method for the adjudication of the controversy in that it will permit a large number of claims to be resolved in a single forum simultaneously, efficiently, and without the unnecessary hardship that would result from the prosecution of numerous individual actions and the duplication of discovery, effort, expense, and the burden on the courts that individual actions would create.

39.     The benefits of proceeding as a class action, including providing a method for obtaining redress for claims that would not be practical to pursue individually, outweigh any difficulties that might be argued with regard to the management of the class action.

## COUNT I

### VIOLATION OF FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT
*Florida Statutes §§ 501.201, et seq.*
**(By Plaintiffs LeRoy and Sun on Behalf of the Florida Class)**

40.     Plaintiffs re-allege and incorporate by reference all paragraphs above as though fully set forth herein.

41.     In Florida, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are unlawful.

42.     Plaintiffs, individually, Tad LeRoy and Sing Sun, and members of the putative Florida Class are "consumers" within the meaning of Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA"), as provided by Florida Statute § 501.203.

43.     Fiat's business acts and practices alleged herein constitute unfair, unconscionable and/or deceptive methods, acts or practices as provided by §§ 501.201-.213, Florida Statutes.

44.     At all relevant times material hereto, Fiat conducted trade and commerce in Florida and elsewhere within the meaning of the CFA.

45.     Fiat's practices, described above, violate FDUPTA for, *inter alia*, one or more of the following reasons:

      a.     Fiat represented that goods or services have sponsorship, approval, characteristics, uses, and benefits that they do not have, including *inter alia*, that the Class Vehicles' diesel engines were "eco diesel";

      b.     Fiat provided, disseminated, marketed, and otherwise distributed uniform false and misleading advertisements, technical data, and other information to consumers regarding the performance, legality, quality, and nature of the Class Vehicles;

      c.     Fiat represented that goods or services were of a particular standard, quality, or grade, when they were of another;

      d.     Fiat deliberately omitted material facts about the Class Vehicles, which did, or tended to, mislead Plaintiffs and the Florida Class about the Class Vehicles' performance and value that could not reasonably be known by the Plaintiff or ordinary consumers;

e.      Fiat failed to reveal facts that were material to the transactions in light of representations of fact made in a positive manner;

f.      Fiat caused Plaintiffs and the Florida Class to suffer a probability of confusion and misunderstanding of legal rights, obligations, and/or remedies by and through its conduct;

g.      Fiat deliberately withheld material facts from Plaintiffs and the Florida Class with the intent that Plaintiffs and the Florida Class rely upon the omissions;

h.      Fiat made material representations and statements of fact to Plaintiffs and the Florida Class that resulted in Plaintiffs and the Class reasonably believing the represented or suggested state of affairs to be other than what they actually were; and

i.      Fiat intended that Plaintiffs and the Florida Class rely on their misrepresentations and omissions, so that Plaintiffs and the Florida Class would purchase the Class Vehicles.

46.     Had Fiat disclosed the omitted material, Plaintiffs and other members of the Florida Class would not have purchased or leased the Class Vehicles or would have paid less for them.

47.     Had Fiat not represented that Class Vehicles possessed "eco diesel" engines with superior qualities (including lower emissions and enhanced fuel economy), Plaintiffs and Florida Class members would not have purchased, or would have paid less for Class Vehicles.

48.     Plaintiffs have also suffered losses resulting from the difference between what he (and the market) understood they would be receiving versus what he received as a result of the existence of the Unapproved AECDs.

49.     Plaintiffs have also been damaged by virtue of the diminution in the value on the

secondary market of the Class Vehicles due to the existence of the Unapproved AECDs, the recall it led to, and the market's unwillingness to purchase Defendant's diesel vehicles.

50.    Class Vehicles may face limitations on registration and sales, which makes them less valuable.

51.    Moreover, even assuming the Class Vehicles can be fixed, any fix will necessarily reduce the performance and fuel economy of the Class Vehicles, diminishing their value.

52.    The foregoing acts, omissions, and practices proximately caused Plaintiffs and the Class to suffer an ascertainable loss and actual damages in the form of, *inter alia*, overpayment at the time of purchase, and diminution of value of the Class Vehicles. Plaintiffs and the class are entitled to recover damages permitted under FDUPTA, including compensatory damages, costs, and reasonable attorneys' fees.

<u>**COUNT II**</u>

**VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW**
**Cal. Bus. & Prof. Code - § 17200, *et seq.***
**(By Plaintiff Bloom on Behalf of the California Class)**

53.    Plaintiffs re-allege and incorporate by reference all paragraphs above ass though fully set forth herein

54.    California Business and Professions Code § 17200, *et seq.* prohibits "any unlawful, unfair or fraudulent business act or practice." CAL. BUS. & PROF. CODE § 17200.

55.    Throughout the Class Period, Defendants engaged in unlawful business acts and/or practices by selling and/or distributing Class Vehicles that violated 203(a)(1) of the Clean Air Act, 42 U.S.C. § 7522(a)(1), the Song-Beverly Warranty Act, and California's Implied Warranty of Merchantability.

56.    The acts, omissions, and practices alleged herein also constitute unfair business

14

acts and practices in that Defendants' conduct is immoral, unscrupulous, and offends public policy by seeking to profit from selling vehicles that fail to abide by EPA standards, and that pose a threat to public health and the environment.

57.     Defendants' practices also constitute "fraudulent" conduct. Defendants owed Plaintiff Bloom and similarly situated Californians a duty to disclose the Unapproved AECDs in Class Vehicles because Defendants possessed exclusive and superior information regarding the manufacture of the products. Defendants' failure to inform consumers that the Vehicles had Unapproved AECDs, not known to and approved by the EPA, was likely to deceive reasonable consumers.

58.     Defendants also misrepresented that the Class Vehicles were "eco diesel," that the Class Vehicles produced lower emissions than non-"eco diesel" vehicles. Plaintiff Bloom relied upon these representations.

59.     As a direct result of Defendants' unlawful, unfair, or fraudulent business acts and/or practices, Plaintiff and Class members suffered injury in fact and lost money or property. Plaintiff and Class members would not have purchased Class Vehicles had they known the material information about the AECDs. Plaintiff and Class members would not have purchased, or would have paid less, for Class Vehicles had it not been for Defendants' deceptive representations.

60.     In addition, Plaintiff and California customers paid too much for the Class Vehicles as Defendants' misrepresentations and omissions allowed it to artificially inflate the value of the Class Vehicles.

61.     Defendants profited from its sales of its falsely and deceptively advertised products to unwary California customers.

15

62.     Accordingly, Plaintiff on behalf of himself and all others similarly situated, seek restitution, and injunctive relief against Defendants in the form of an order prohibiting Defendants from engaging in the alleged misconduct described herein, and other relief as specifically prayed for herein.

### COUNT III

**VIOLATION OF THE CALIFORNIA LEGAL REMEDIES ACT**
**Cal. Civ. Code § 1750**
**(By Plaintiff Bloom on Behalf of the California Class)**

63.     Plaintiffs re-allege and incorporate by reference herein all of the allegations above as though fully set forth herein.

64.     Fiat is a person as defined by California Civil Code § 1761(c).

65.     Class Vehicles are goods within the meaning of California Civil Code § 1761(a).

66.     Plaintiff and the California Class members are consumers within the meaning of California Civil Code §1761(d), and their sale to consumers constitutes a transaction under §1761(e).

67.     Through its fraudulent omissions of the Unapproved AECDs, Fiat violated Cal. Civ. Code § 1770(a)(5), by  representing that the Class Vehicles had "sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities" that they did not have.

68.     Through its fraudulent representations regarding "eco diesel" engines and their supposedly superior qualities, Fiat violated Cal. Civ. Code § 1770(a)(5), by representing that the Class Vehicles had "sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities" that they did not have.

69.     Through its fraudulent omissions of the Unapproved AECDS, Fiat violated California Code § 1770(a)(7) by representing that goods are of a particular standard, quality or

grade that they did not have.

70.     Through its fraudulent representations regarding "eco diesel" engines and their supposedly superior qualities, Fiat violated California Code § 1770(a)(7) by representing that goods are of a particular standard, quality or grade that they did not have.

71.     The information regarding the Unapproved AECDS withheld from Plaintiff Bloom and the California Class was material information in that would impact the ordinary consumer making a transaction.

72.     The representations made to Plaintiff Bloom and the California Class regarding "eco diesel" engines and their supposed superiority was material information that would affect the ordinary consumer making a transaction.

73.     Defendants owed Plaintiff Bloom and similarly situated Californians a duty to disclose the Unapproved AECDs in Class Vehicles because Defendants possessed exclusive and superior information regarding the manufacture of the products, and the installation of the Unapproved AECDs. Defendants' failure to inform consumers of the Unapproved AECDs was likely to deceive reasonable consumers.

74.     Plaintiff and Class members would not have purchased Class Vehicles had they known the material information about the AECDs. Plaintiff and Class members would not have purchased, or would have paid less, for Class Vehicles had it not been for Defendants' deceptive representations.

75.     As a result of Fiat's conduct, Plaintiff Bloom and Class members suffered actual damages.

76.     Plaintiffs seek equitable relief, including an injunction from this Court, prohibiting Fiat from engaging its deceptive practices.

## COUNT IV

### VIOLATION OF SONG-BEVERLY CONSUMER WARRANTY ACT FOR BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### Cal. Civ. Code §§ 1791.1 and 1792
### (By Plaintiffs on Behalf of their respective California and Florida Classes)

77.     Plaintiffs re-allege and incorporate by reference all paragraphs above as though fully set forth herein.

78.     Fiat is and was at all relevant times a merchant with respect to the Class Vehicles. Fiat directly sold and marketed its Class Vehicles to customers through authorized dealers, for the intended purpose of consumers purchasing the Class Vehicles. The Class Vehicles passed from the dealer to the Plaintiffs and Class members without modification.

79.     Plaintiff Bloom and other California Class members who purchased or leased the Class Vehicles in California are "buyers" within the meaning of Cal. Civ. Code § 1791(b).

80.     The Class Vehicles are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

81.     Defendants are a "manufacturer" of the Class Vehicles within the meaning of Cal Civ. Code § 1791(j).

82.     Defendants impliedly warranted to Plaintiffs and the Classes that Class Vehicles were "merchantable" as per Cal Civ. Code §§ 1791.1(a), including that the Class Vehicles would pass without objection in the trade under the contract description; they are fit for the ordinary purposes for which such goods are used; they are adequately contained, packaged, and labeled; and they conform to the promises or affirmations of fact made on the container or label.

83.     Class Vehicles would not pass without objection in their trade, were not of fair average quality, and are not fit for the ordinary purposes for which they were sold. Because of the Unapproved AECDs, the Class Vehicles do not conform to their Certificates of Compliance.

18

84.     Class Vehicles are not adequately labeled because the Class Vehicles fails to conform with their labeling and packaging.

85.     Class Vehicles were defective at the time they were in the possession of Fiat because of the Unapproved AECDs described herein. Defendants knew of this defect at the time it sold the Class Vehicles.

86.     Plaintiff Bloom and Class members have performed each and every duty required of them under the terms of the warranties, except as may have been excused or prevented by the conduct of Defendants or by operation of law in light of Defendants' unconscionable conduct.

87.     Defendants received timely notice regarding the problems at issue in this litigation, through the EPA's Notice of Violation. Notwithstanding this notice, Defendants have failed and refused to offer an effective remedy to its Unapproved AECDs.

88.     Plaintiffs and members of the Classes have had sufficient dealings with either Fiat or its agents (authorized Fiat dealers) to establish privity of contract. Notwithstanding this, privity is not required in this case because Plaintiffs and members of the Classes are intended third-party beneficiaries of contracts of the implied warranty of merchantability.

89.     Any attempts by Defendants to disclaim the implied warranty of merchantability is unenforceable, as the disclaimer failed to mentioned the implied warranty of merchantability and were not conspicuous as required by law, and were both procedurally and substantively unconscionable, rendering them unenforceable.

90.     As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Plaintiffs and Class members suffered economic damages, including the diminished value of their Class Vehicles.

91.     Pursuant to Cal. Civ. Code §§ 1791.1(d) & 1794, Plaintiff and California Class

members are entitled to damages and other legal and equitable relief including, the purchase price of their Class Vehicles, or the overpayment or diminution in value of their Class Vehicles.

92.     Pursuant to Cal. Civ. Code § 1794, Plaintiffs and California Class members are entitled to costs and attorney fees.

## COUNT V

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### Cal. Com. Code §§ 2314 and 10212
### (By Plaintiff Bloom on Behalf of the California Class)

93.     Plaintiffs reallege and incorporate by reference all paragraphs above as though fully set forth herein.

94.     Defendants are at all relevant times a "merchant" of motor vehicles under Cal. Com. Code §§ 2014(1) and 10103(c), and "sellers' of motor vehicles under § 2013(1)(d).

95.     With respect to leases, Defendants are at all relevant times "lessors" of motor vehicles under Cal. Com. Code § 10103(a)(16).

96.     The Class Vehicles are and were at all relevant times "goods" within the meaning of Cal. Com. Code § 2105(1) and 10103(a)(8).

97.     A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Cal. Com. Code §§ 2314 and 10212.

98.     These Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose in which vehicles are used. Because of the Unapproved AECDs, the Class Vehicles do not conform to their Certificates of Compliance.

99.     Defendants were provided notice by the EPA's Notice of Violation.

100.     As a direct and proximate results of Defendants' breach of the implied warranty of merchantability, Plaintiff and the other California Class members have been damaged in an amount to be proven at trial.

## COUNT VI

**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**Florida Statute § 672.314 and 680.212**
**(By Plaintiffs LeRoy and Sun on Behalf of the Florida Class)**

101.     Plaintiffs re-allege and incorporate by reference all paragraphs above as though fully set forth herein.

102.     Defendants are at all relevant time a "merchant" of motor vehicles under Florida Statutes §§ 672.104(1) and 680.1031(3)(k), and "sellers" of motor vehicles under § 672.103(1)(d).

103.     With respect to leases, Defendants are at all relevant times "lessors" of motor vehicles under Florida Statute §§ 680.1031(1)(p).

104.     The Class Vehicles are and were at all relevant times "goods" within the meaning of Florida Statute §§ 680.1031(1)(p).

105.     A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Florida Statute §§ 672.314 and 680.212.

106.     These Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose in which vehicles are used. Because of the Unapproved AECDs, the Class Vehicles do not conform to their Certificates of Compliance.

107.     Fiat was provided notice by the EPA's Notice of Violation.

21

108.   As a direct and proximate results of Defendants' breach of the implied warranty of merchantability, Plaintiffs and the other Florida Class members have been damaged in an amount to be proven at trial.

## COUNT VII

**BREACH OF EXPRESS CALIFORNIA EMISSIONS WARRANTIES**
**Cal. Civ. Code §§ 1793.2, *et seq.***
**(By Plaintiff Bloom on Behalf of the California Class)**

109.   Plaintiffs re-allege and incorporates by reference all paragraphs above as though fully set forth herein.

110.   California law imposes certain duties on manufacturers who sell consumer goods in California with express warranties. Cal. Civ. Code § 1793.2. When manufacturers of motor vehicles and their representatives in California are unable to repair a new motor vehicle so that it complies with their express warranties after a reasonable number of attempts, "the manufacturer shall either promptly replace the new motor vehicle or promptly make  restitution to the buyer" at the vehicle owner's option. See Cal. Civ. Code § 1793.2(d)(2).

111.   Class Vehicles are covered by express California Emissions Warranties as a matter of law. *See* Cal. Health & Safety Code § 43205; Cal. Code Regs tit. 13, § 2037.

112.   The express California Emissions Warranties provide that "the vehicle or engine is ... designed, built, and equipped so as to conform with all applicable regulations adopted by the Air Resources Board. *Id.* This provision applies without any time or mileage limitation. *Id.*

113.   The California Emissions Warranties also specifically warrant California Class members against any performance failure of the emissions control system for three years or 50,000 miles, whichever occurs first, and against any defect in any emission-related part for seven years or 70,000 miles, whichever occurs first. *See id.*

114.   Class members are excused from the requirement to "deliver nonconforming goods to the manufacturer's service and repair facility within this state" because it cannot reasonably be accomplished due to the nature of the nonconformity. Cal. Civ. Code § 1793.2(c).

115.   This complaint services as written notice of Fiat's nonconformity, and California Class members are excused from any requirement that they allow a "reasonable number of attempts" to bring California Vehicles into conformity with their California Emissions Warranties based on futility.

116.   Class members are entitled to "recover a civil penalty of up to two times the amount of damages." Cal. Civ. Code § 1794(e)(1).

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, individually and on behalf of all others similarly situated, requests that the Court enter judgment against Defendants and in favor of Plaintiffs and the Class and award the following relief:

A.   Certifying the Classes, declaring Plaintiffs as representatives of the Classes and Plaintiff's counsel as counsel for the Classes;

B.   Awarding Plaintiffs and the Classes actual damages, consequential damages, specific performance, restitution, civil penalties, and/or rescission, where appropriate;

C.   Awarding Plaintiffs and the Classes pre- and post-judgment interest;

D.   Awarding Plaintiffs and the Classes reasonable attorneys' fees and costs of suit;

E.   Issuing an injunction prohibiting Fiat from engaging in the deceptive practices described herein; and

E.   Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all matters triable as of right by a jury.


Dated: January 23, 2017

Respectfully submitted:


/s/ David J. Shea
DAVID J. SHEA (P41399)
BRIAN C. GRANT (P71066)
**SHEA AIELLO PLLC**
21600 American Dr., Second Floor
Southfield, MI 48034
Telephone:   (248) 354-0224
Facsimile:   (248) 354-0440
david.shea@sadplaw.com

THEODORE J. LEOPOLD (*pro hac forthcoming*)
**COHEN MILSTEIN SELLERS & TOLL PLLC**
2925 PGA Boulevard, Suite 200
Palm Beach Gardens, FL 33410
Telephone:  (202) 408-4600
Facsimile:   (202) 408-4699
tleopold@cohenmilstein.com

ANDREW N. FRIEDMAN (*pro hac forthcoming*)
DOUGLAS J. MCNAMARA (*pro hac forthcoming*)
ERIC A. KAFKA (*pro hac forthcoming*)
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Ave. NW
Suite 500, West Tower
Washington, DC 20005
Telephone:  (202) 408-4600
Facsimile:   (202) 408-4699
afriedman@cohenmilstein.com
dmcnamara@cohenmilstein.com
ekafka@cohenmilstein.com

STEVEN G. CALAMUSA (*pro hac forthcoming*)
ROBERT E. GORDON (*pro hac forthcoming*)
**GORDON & DONER**
4114 Northlake Blvd.,
Palm Beach Gardens, FL 33410

Telephone:  (561) 799-5070
Facsimile:   (561) 799-4050
SCalamusa@ForTheInjured.com
RGordon@ForTheInjured.com

*Counsel for Plaintiffs and Proposed Classes*

# Exhibit A



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
WASHINGTON, D.C. 20460

OFFICE OF
ENFORCEMENT AND
COMPLIANCE ASSURANCE

*VIA CERTIFIED MAIL*
*RETURN RECEIPT REQUESTED*

JAN  2  2017

Fiat Chrysler Automobiles N.V.
FCA US LLC
Thru:

Kyle M.H. Jones
Senior Counsel
Environment, Health and Safety
Office of the General Counsel
FCA US LLC
1000 Chrysler Drive, CIMS 485-13-62
Auburn Hills, MI 4832602766

Jonathan S. Martel
Joel M. Gross
Arnold & Porter LLP
601 Massachusetts Ave., NW
Washington, DC 20001-3743

Re:   Notice of Violation for Model Year 2014-2016 diesel light-duty vehicles (Dodge
Ram and Jeep Grand Cherokee)

Dear Messrs. Jones, Martel and Gross:

The United States Environmental Protection Agency (EPA) has investigated and continues to investigate Fiat Chrysler Automobiles N.V. and FCA US LLC (collectively, FCA) for compliance with the Clean Air Act (CAA), 42 U.S.C. §§ 7401–7671q, and its implementing regulations. As detailed in this Notice of Violation (NOV), the EPA has determined that FCA failed to disclose Auxiliary Emission Control Devices (AECDs) in certain model year 2014 through 2016 (MY14-16) diesel light-duty vehicles equipped with 3.0 liter engines. These AECDs were not disclosed in the initial motor vehicle applications for certificates of conformity (COCs) that permit the introduction of motor vehicles into United States commerce. The

AECDs, with certain exceptions, are present in the approximately 103,828 motor vehicles identified in the table below.

| Model Year | EPA Test Group | Make and Model(s) | 50 State Volume |
|---|---|---|---|
| 2014 | ECRXT03.05PV | FCA Dodge Ram 1500 | 14,083 |
| 2014 | ECRXT03.05PV | FCA Jeep Grand Cherokee | 14,652 |
| 2015 | FCRXT03.05PV | FCA Dodge Ram 1500 | 31,984 |
| 2015 | FCRXT03.05PV | FCA Jeep Grand Cherokee | 8,421 |
| 2016 | GCRXT03.05PV | FCA Dodge Ram 1500 | 32,219 (projected) |
| 2016 | GCRXT03.05PV | FCA Jeep Grand Cherokee | 2,469 (projected) |

Eight (8) specific AECDs are identified in Attachment A, which is marked as Confidential Business Information (CBI) as FCA may assert a CBI claim for some or all of these AECDs. *See* 40 C.F.R. § 2.203(b). The AECDs are described by an EPA-assigned number and name, and a short paragraph generally identifying the AECD by function.

The EPA has determined that, due to the existence of at least these eight undisclosed AECDs in these vehicles, these vehicles do not conform in all material respects to the vehicle specifications described in the applications for the COCs that purportedly cover them. Therefore, FCA violated section 203(a)(1) of the CAA, 42 U.S.C. § 7522(a)(1), for each time it sold, offered for sale, introduced into commerce, or delivered for introduction into commerce or imported these vehicles (or caused any of the foregoing acts with respect to these vehicles).

Operation of one or more of the eight undisclosed AECDs, either alone or in combination with each other, results in excess emissions of nitrogen oxides (NOx) under various operating conditions that may reasonably be expected to be encountered in normal vehicle operation and use. FCA did not disclose these AECDs to the EPA in their applications for COCs, despite being aware that the AECDs were required to be disclosed. The EPA has determined that, unless FCA can establish that the undisclosed AECDs qualify for one of the narrow exclusions provided under the applicable regulations, one or more of the AECDs identified in this NOV, whether alone or in combination with each other, would constitute defeat devices that reduce the effectiveness of the vehicles' emission control system that exist to comply with CAA emission standards. *See* 40 C.F.R. §§ 86.1803, 86.1809 (defining and prohibiting defeat devices). Therefore, after further investigation regarding the operation of the undisclosed AECDs, the EPA may assert that FCA committed additional violations of section 203(a)(1) of the CAA, 42 U.S.C. § 7522(a)(1), for each time it sold, offered for sale, introduced into commerce, delivered for introduction into commerce or imported vehicles with defeat devices (or caused any of the foregoing acts) that prevent the vehicles from conforming in all material respects to the vehicle specifications described in the applications for the COCs.

Additionally, the EPA is continuing its investigation into the operation of the undisclosed AECDs and whether FCA violated section 203(a)(3)(B) of the CAA, 42 U.S.C. § 7522(a)(1).

Background and Law Governing Alleged Violations

Violations in this matter arise under Part A of Title II of the CAA, 42 U.S.C. §§ 7521–7554, and the regulations promulgated thereunder. In creating the CAA, Congress found, in part, that "the increasing use of motor vehicles . . . has resulted in mounting dangers to the public health and welfare." CAA § 101(a)(2), 42 U.S.C. § 7401(a)(2). Congress' purpose in creating the CAA, in part, was "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population," and "to initiate and accelerate a national research and development program to achieve the prevention and control of air pollution." CAA § 101(b)(1)–(2), 42 U.S.C. § 7401(b)(1)–(2). The CAA and the regulations promulgated thereunder aim to protect human health and the environment by reducing emissions of NOx and other pollutants from mobile sources of air pollution. Nitrogen oxides are a family of highly reactive gases that play a major role in the atmospheric reactions with volatile organic compounds (VOCs) that produce ozone (smog) on hot summer days. Breathing ozone can trigger a variety of health problems including chest pain, coughing, throat irritation, and congestion. Breathing ozone can also worsen bronchitis, emphysema, and asthma. Children are at greatest risk of experiencing negative health impacts from exposure to ozone.

The EPA's allegations here concern light-duty motor vehicles for which 40 C.F.R. Part 86 sets emission standards and test procedures, and section 203 of the CAA, 42 U.S.C. § 7522, sets compliance provisions. Light-duty vehicles must satisfy emission standards for certain air pollutants, including NOx. 40 C.F.R. § 86.1811-04. The EPA administers a certification program to ensure that every vehicle introduced into United States commerce satisfies applicable emission standards. Under this program, the EPA issues certificates of conformity (COC's), and thereby approves the introduction of vehicles into United States commerce.

To obtain a COC, a light-duty vehicle manufacturer must submit a COC application to the EPA for each test group of vehicles that it intends to enter into United States commerce. 40 C.F.R. § 86.1843-01. The COC application must include, among other things, a list of all AECDs installed on the vehicles. 40 C.F.R. § 86.1844-01(d)(11). An AECD is "any element of design which senses temperature, vehicle speed, engine RPM, transmission gear, manifold vacuum, or any other parameter for the purpose of activating, modulating, delaying, or deactivating the operation of any part of the emission control system." 40 C.F.R. § 86.1803-01. The COC application must also include "a justification for each AECD, the parameters they sense and control, a detailed justification of each AECD that results in a reduction in effectiveness of the emission control system, and [a] rationale for why it is not a defeat device." 40 C.F.R. § 86.1844-01(d)(11). Electronic control systems that may receive inputs from multiple sensors and control multiple actuators that affect the emission control system's performance are AECDs. EPA, *Advisory Circular Number 24-2: Prohibition of Emission Control Defeat Devices – Optional Objective Criteria* (Dec. 6, 1978). "Such elements of design could be control system logic (i.e., computer software), and/or calibrations, and/or hardware items." *Id.*

"Vehicles are covered by a certificate of conformity only if they are in all material respects as described in the manufacturer's application for certification. . ." 40 C.F.R. § 86.1848-10(c)(6). Similarly, a COC issued by the EPA, including those issued to FCA, states expressly, "[t]his certificate covers only those new motor vehicles or vehicle engines which conform, in all

3

material respects, to the design specifications" described in the application for that COC. *See also* 40 C.F.R. §§ 86.1844-01 (listing required content for COC applications), 86.1848-01(b) (authorizing the EPA to issue COCs on any terms that are necessary or appropriate to assure that new motor vehicles satisfy the requirements of the CAA and its regulations).

Manufacturers are prohibited from selling, offering for sale, introducing into commerce, delivering for introduction into commerce, or importing, any new motor vehicle unless that vehicle is covered by an EPA-issued COC. CAA § 203(a)(1), 42 U.S.C. § 7522(a)(1); 40 C.F.R. § 86.1854-12(a)(1). It is also a violation to cause any of the foregoing acts. CAA § 203(a), 42 U.S.C. § 7522(a); 40 C.F.R. § 86.1854-12(a). Additionally, the CAA makes it a violation "for any person to manufacture or sell, or offer to sell, or install, any part or component intended for use with, or as part of, any motor vehicle or motor vehicle engine, where a principal effect of the part or component is to bypass, defeat, or render inoperative any device or element of design installed on or in a motor vehicle or motor vehicle engine in compliance with regulations under this subchapter, and where the person knows or should know that such part or component is being offered for sale or installed for such use or put to such use." CAA § 203(a)(3)(B), 42 U.S.C. § 7522(a)(3)(B); 40 C.F.R. § 86.1854-12(a)(3)(ii).

A defeat device is an AECD "that reduces the effectiveness of the emission control system under conditions which may reasonably be expected to be encountered in normal vehicle operation and use, unless: (1) Such conditions are substantially included in the Federal emission test procedure; (2) The need for the AECD is justified in terms of protecting the vehicle against damage or accident; (3) The AECD does not go beyond the requirements of engine starting; or (4) The AECD applies only for emergency vehicles . . . ." 40 C.F.R. § 86.1803-01.

Manufacturers of diesel-fueled motor vehicles equip the vehicles with exhaust gas recirculation (EGR) and selective catalyst reduction (SCR) systems to reduce NOx emissions. An EGR system is designed to return a variable amount of the already combusted exhaust gas back into the engine. This reduces the engine combustion temperature, which in turn reduces the formation of NOx; EGR is the primary control mechanism for reduction of NOx emissions from the engine. An SCR aftertreatment system is separate from the diesel engine and injects urea, often identified as diesel exhaust fluid (DEF), into the exhaust gas to chemically convert the NOx emissions into nitrogen ($N_2$) and water as the exhaust flows through the SCR catalyst. The DEF must be periodically refilled by the vehicle operator to maintain continuous operation of the SCR system. When the fluid is not replaced, or when the SCR does not operate properly, NOx emissions increase significantly. Certain defeat devices can cause the EGR or SCR systems to operate less effectively, or not at all, during certain operating conditions.

Motor vehicles equipped with defeat devices cannot be certified. EPA, *Advisory Circular Number 24: Prohibition on use of Emission Control Defeat Device* (Dec. 11, 1972); *see also* 40 C.F.R. § 86.1809-12.

Alleged Violations

This NOV is based in part on vehicle emission testing performed by the EPA at the National Vehicle and Fuel Emissions Laboratory (NVFEL). This testing was performed since the EPA's

announcement on September 25, 2015, that it would perform additional testing "using driving cycles and conditions that may reasonably be expected to be encountered in normal operation and use, for the purposes of investigating a potential defeat device." EPA, EPA Conducted Confirmatory Testing (Sept. 25, 2015). The EPA has identified at least eight AECDs in the 3.0 liter diesel-fueled FCA motor vehicles listed in the table above that were not described in the application for the COC that purportedly covers each motor vehicle; most AECDs have been identified as a result of the EPA's investigation. The following is a list of the identified AECDs:

AECD #1 (Full EGR Shut-Off at Highway Speed)
AECD #2 (Reduced EGR with Increasing Vehicle Speed)
AECD #3 (EGR Shut-off for Exhaust Valve Cleaning)
AECD #4 (DEF Dosing Disablement during SCR Adaptation)
AECD #5 (EGR Reduction due to Modeled Engine Temperature)
AECD #6 (SCR Catalyst Warm-Up Disablement)
AECD #7 (Alternative SCR Dosing Modes)
AECD #8 (Use of Load Governor to Delay Ammonia Refill of SCR Catalyst)

As described in Attachment A, some of these AECDs appear to cause the vehicle to perform differently when the vehicle is being tested for compliance with the EPA emission standards using the Federal emission test procedure (e.g. FTP, US06), than in normal operation and use.

In meetings with the EPA, FCA's representatives have discussed the use of these AECDs. FCA instituted a voluntary recall for AECD #1 in 2015, referred to as the 2014 Field Fix, and FCA has represented to the EPA that AECD #1 is not present in the MY 2015 and MY 2016 vehicles identified in the above table.

The EPA has reviewed the information provided by FCA, and the NVFEL has conducted additional testing. The test data shows that these vehicles have high NOx emissions under certain conditions.

The following list identifies discrete examples where the effectiveness of the emission control system is reduced:
- Combined operation of AECD #3 with AECD #7 or AECD #8 reduces in certain situations the effectiveness of the overall emission control system by disabling one key component of that system, the EGR system, without compensating by increasing the effectiveness of the other critical component, the SCR system. AECD #3 employs a timer to shut-off EGR; this EGR disablement does not appear justified for protecting the vehicle, nor does it meet any of the other exceptions of the defeat device regulatory definition. Under certain conditions reasonably expected to be encountered in normal vehicle operation and use, the SCR is unable to compensate for the reduced effectiveness caused by EGR shut-off and the overall effectiveness of the emission control system is reduced.
- The operation of AECD #5, together with AECD #6, at temperatures outside of those found in the Federal emission test procedure reduces the effectiveness of the NOx emission control system under conditions reasonably expected to be encountered in normal vehicle operation and use. In addition, a timer is used to discontinue warming of

5

the SCR aftertreatment system, thereby reducing its effectiveness, in a manner that does not appear to be justified to protect the vehicle.

- The operation of AECD #4, particularly when combined with AECD #8, increases emissions of tailpipe NOx under conditions reasonably expected to be encountered in normal vehicle operation and use. The operation of AECD #1, AECD #2 and/or AECD #5 increase the frequency of occurrence of AECD #4.

- The operation of AECDs #7 and #8, particularly in variable grade and high load conditions, increases emissions of tailpipe NOx under conditions reasonably expected to be encountered in normal vehicle operation and use.

These AECDs were neither described nor justified in the applicable COC applications, as required by EPA regulations. Therefore, each vehicle identified by the table above does not conform in a material respect to the vehicle specifications described in the COC application. As such, FCA violated section 203(a)(1) of the CAA, 42 U.S.C. § 7522(a)(1), each time it sold, offered for sale, introduced into commerce, delivered for introduction into commerce, or imported (or caused any of the foregoing with respect to) approximately 103,828 new motor vehicles within these test groups.

The EPA believes that one or more of the AECDs, whether alone or in combination with each other, reduce the effectiveness of the emission control system under conditions which may reasonably be expected to be encountered in normal vehicle operation and use. These AECDs: (1) occur in operating conditions that may not be part of the Federal emission test procedure; and (2) may not be justified in terms of protecting the vehicle against damage or accident; they do not otherwise qualify for the enumerated defeat device exceptions of 40 C.F.R. § 86.1803-01. Therefore, one or more of the AECDs, whether alone or in combination, may be defeat devices. To date, despite having the opportunity to do so, FCA has failed to establish that these are not defeat devices. After further investigation into whether these are defeat devices, the EPA may assert that FCA committed additional violations of section 203(a)(1) of the CAA, 42 U.S.C. § 7522(a)(1).

In addition to these undisclosed AECD allegations under section 203(a)(1) of the CAA, 42 U.S.C. § 7522(a)(1), the EPA intends to continue its investigation to determine whether the manufacture, sale, offering for sale, or installation of one or more of the undisclosed AECDs constitute defeat device violations of section 203(a)(3)(B) of the CAA, 42 U.S.C. § 7522(a)(3)(B). To date, despite having the opportunity to do so, FCA has failed to demonstrate that FCA did not know, or should not have known, that a principal effect of one or more of these AECDs was to bypass, defeat, or render inoperative one or more elements of design installed to comply with emissions standards under the CAA.

Enforcement

The EPA's investigation into this matter is continuing. The above information represents specific violations that the EPA believes, at this point, are sufficiently supported by evidence to warrant the allegations in this NOV. The EPA may find additional violations as the investigation continues.

The EPA is authorized to refer this matter to the United States Department of Justice for initiation of appropriate enforcement action. Any manufacturer who, on or after January 13, 2009, sold, offered for sale, introduced into commerce, delivered for introduction into commerce, imported, or caused any of the foregoing acts with respect to any new motor vehicle that was not covered by an EPA-issued COC is subject, among other things, to a civil penalty of up to $44,539 for each violation. CAA § 205(a), 42 U.S.C. § 7524(a); 40 C.F.R. § 19.4. The EPA may seek, and district courts may order, equitable remedies to further address these alleged violations. CAA § 204(a), 42 U.S.C. § 7523(a).

The EPA is available to discuss this matter with you. Please contact Kathryn Caballero, the EPA attorney assigned to this matter, to discuss this NOV. Ms. Caballero can be reached as follows:

> Kathryn Pirrotta Caballero
> U.S. EPA, Air Enforcement Division
> 1200 Pennsylvania Avenue, NW (MC 2242A)
> William Jefferson Clinton South Federal Building
> Washington, DC 20460
> (202) 564-1849
> caballero.kathryn@epa.gov

Sincerely,

Phillip A. Brooks
Director
Air Enforcement Division
Office of Civil Enforcement

Copy:
Todd Sax, California Air Resources Board
Thomas A. Mariani Jr., United States Department of Justice